In re Richard F. IACOVONI, Hollis Dean Snelson and Renee Cook Snelson, L. Craig Matern and Ranae D. Matern, Manuel G. Montoya and Dorothy E. Montoya, Robert L. Cartwright and Paula E. Cartwright, Garn M. Bishop and Bonnie W. Bishop, Rich Epperson and Shayne Epperson, Michael A. Love and Anna R. Love, Debtors.

Bankruptcy Nos. B–79–01214, B–79–01223, B–79–01261, B–79–01266, B–79–01265, B–79–01267, B–79–01280 and B–79–01347.

United States Bankruptcy Court, D. Utah, C. D.

Jan. 21, 1980.

Evan M. Hansen, standing Chapter 13 trustee.

Richard Calder, Salt Lake City, Utah, for debtors.

Mary Ann Casper, of Sears Roebuck and Co. in *In re Iacovoni.*

Mel Hanks, pro se.

Charles Mason, for Utah State Employees Credit Union, and counsel for First Security Bank in *In re Snelson.*

Sylvia Houston, for Avco Thrift in *In re Cartwright.*

Fred W. Burton, Yreka, Cal., for Murray First Thrift in *In re Love*.

## OPINION AND ORDER

RALPH R. MABEY, Bankruptcy Judge.

Since the October 1, 1979, effective date of the new Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, several petitions and plans have been filed under Chapter 13, 11 U.S.C. §§ 1301 *et seq.*, which propose to pay either nothing or very little to creditors. Individuals have filed under Chapter 13 whose only regular income is welfare payments. Unsecured debts have been classified and treated separately solely on the basis of the presence of a codebtor. These cases raise three basic questions concerning the interpretation and application of the provisions of Chapter 13: (1) what constitutes regular income for the purpose of qualifying to file under Chapter 13; (2) whether debts can be classified and treated differently solely on the basis of the presence of a codebtor; and (3) whether, and under what circumstances if any, the Court may require some payment to holders of unsecured claims as a prerequisite to confirmation of a Chapter 13 plan. The following facts bring these issues sharply into focus.

### Summary of Facts

1. *In re Iacovoni*. Petitioner works part time as an English Instructor at the University of Utah earning $444.44 per month or approximately $5,335 a year. He earned $13,000 in the previous year. He has no secured debts, and has accumulated $17,-109.40 in unsecured debts, $13,000 of which were incurred as government-insured student loans. He claims all of his property as exempt, claims $4.44 per month as his only excess income, and proposes to pay nothing under his plan to any creditors. Creditors would receive no dividend if the case were filed under Chapter 7, 11 U.S.C. §§ 701 *et seq.*

2. *In re Snelson*. Petitioners have a gross income of $914 per month and a net income of $512.16 per month. Their claimed excess over budgeted needs amounts to $76.16 per month. They have accumulated $3,954.66 in unsecured debts, and their secured debts consist of $2,100 to be paid outside of the plan, a $1,000 lien which the debtors seek to avoid under 11 U.S.C. § 522(f), liens of $6,300 and $1,275 concerning which debtors choose to surrender the property in lieu of payment as allowed in 11 U.S.C. § 1325(a)(5)(C), and a lien of $925.03 on which debtors propose to pay $360, the claimed value of the property, under 11 U.S.C. § 1325(a)(5)(B). Payments under the plan would thus consist of nothing to unsecured creditors, as this case would, like *Iacovoni*, be a no asset case under Chapter 7, and a total of $11.96 each month to one secured creditor with 96 cents being paid each month to the trustee as administrative costs.

3. *In re Matern*. Petitioners earn a gross income of $961.84 per month resulting in a net income of $741.16 per month. They claim an excess of $101.16 per month after living expenses have been paid. They have secured debts totaling $9,500, $2,800 of which they seek to affirm and to pay outside of the plan. They propose to surrender the property securing the remaining amounts so as to eradicate those secured debts. Their unsecured debts total $3,233. As their assets are all claimed as exempt, leaving no dividend for creditors if filed under Chapter 7, they propose to pay these unsecured creditors nothing with the exception of People's First Thrift, a lender which they propose to pay in full. The only justification for classifying this unsecured creditor in a separate class is the presence of a codebtor on the debt. Of their $101.16 monthly excess over budget, petitioners desire to pay $19.93 per month to be disbursed to People's First Thrift and $1.59 per month to be paid to the trustee as administrative expenses. The plan contemplates no other payments.

4. *In re Montoya*. Petitioners in this case earn a gross amount of $1,401.96 per month, take home being $1,064.76 per month. Out of this amount, they claim an excess of only $17.76 per month after subtraction of living expenses. Secured debts amounting to $1,823.97 they seek to avoid

under 11 U.S.C. § 522(f), and the only other secured debt of $31,200 owed to Mason McDuffie on their personal residence, they propose to keep current outside of the plan. They have unsecured debts totaling $13,-160.61, of which they propose to pay nothing, which is equal to the amount which would have been paid under a Chapter 7 liquidation. Thus, the total amount to be paid under the plan is nothing.

5. *In re Cartwright.* Petitioners earn a gross amount of $1,010.48 per month, bringing home a net amount of $845 per month. They claim an excess of $20 per month after living expenses. Their only secured debts, which total $4,974, they seek to avoid under 11 U.S.C. § 522(f). Their unsecured debts total $5,353.89, of which they propose to pay nothing, the amount which would be distributed if a Chapter 7 had been filed. Thus, the total to be paid out under the plan is nothing.

6. *In re Bishop.* Last year, these petitioners made $26,000. The husband is now a student, and their only income consists of welfare payments of $836 per month. Out of this they claim an excess of $15 per month. They have only one secured debt in the amount of $4,886.50, which debt they propose to limit to $575, the claimed value of the property secured. This amount is to be paid out under the plan over 36 months. Unsecured debts have been accumulated in the amount of $8,473.51, of which they propose to pay nothing as their case would be a no asset case if brought under Chapter 7.

7. *In re Epperson.* Petitioners have a gross income of $1,120 per month with net income of $868 per month. Excess after living expenses is $48 per month. A secured debt to Commercial Security Bank in the amount of $712 is to be reduced to $200, the claimed value of the security, and this amount is to be paid out under the plan over 36 months. It is not clear from the plan what the proposed treatment of another secured debt listed in the amount of $4,000 is to be. The debtors have unsecured debts in the amount of $8,712.64. With the exception of $1,200 owing to People's First Thrift, they propose to pay nothing on these unsecured debts, this being the amount which would have been received under a Chapter 7 liquidation. The separate classification of the unsecured debt owed People's First Thrift, to which debtors propose to make 100 percent payment, is based on the fact that this debt has a codebtor.

8. *In re Love.* Regular income for these petitioners is in the amount of $1,740.80 per month gross and $1,511.32 per month net. Excess is claimed to be $86.84 per month after living expenses. They owe $64,955.55 in secured debts, $60,342.27 of which they seek to affirm and pay on schedule outside of the plan. Of the remaining $4,613.28 owed to the secured creditors they seek to avoid $763.28 under 11 U.S.C. § 522(f), and to abandon the property to eradicate the remaining secured debt. They owe $3,355.50 in unsecured debts. To these creditors, they propose to pay nothing, having claimed all their assets as exempt so as to leave no dividend for creditors in the case of a filing of a Chapter 7. Thus, the total amount to be paid under the plan is zero.

The fact patterns found in these cases and other similar cases filed in this Court reflect the broad statutory invitation to debtor's relief which is Chapter 13. To be determined is the extent, if any, to which the Court must shape and confine these fact patterns to conform with the statute.

### Welfare Payments as Regular Income

■ The question of what constitutes regular income is raised in the *Bishop* case, where petitioners' only income is derived from welfare payments. "Regular income" qualifies an individual for requesting relief under Chapter 13. The definition of "individual with regular income" is given in 11 U.S.C. § 101(24):

> "individual with regular income" means individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title, other than a stock broker or a commodity broker;

This definition greatly increases the availability of Chapter 13 relief which, under

former law, 11 U.S.C. § 1006(8), was limited to individuals "whose principal income is derived from *wages, salary* or *commissions.*" (Emphasis added.) The legislative history makes clear that the present definition under the new Code is to be interpreted broadly, and that any stable, regular income from any source, specifically including "welfare, social security, fixed pension incomes, or . . . investment incomes," is sufficient to qualify the individual for Chapter 13 relief. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 312 (1977). S.Rep. No. 95–989, 95th Cong., 2d Sess. 24 (1978), U.S. Code Cong. & Admin. News, pp. 5787, 5810. These reports interpret the statutory definition to include as well self-employed individuals who have regular incomes. Thus, a liberal interpretation of "regular income" is mandated by specific legislative history. The welfare income of the Bishops is sufficient to make them eligible to file under Chapter 13. As discussed later, their income or assets must be adequate, however, to allow them to make some payment to unsecured creditors in order to obtain confirmation of their plan.

*Classifying Unsecured Co-Obligor Debts*

█ The plans proposed in *In re Matern* and *In re Epperson* require the Court to determine whether an unsecured debt for which there is a codebtor may, by reason of the codebtor, be classified separately and treated differently from other unsecured debts. 11 U.S.C. § 1322(b)(1) allows the plan to designate "a class or classes of unsecured claims, as provided in Section 1122 of this title, but [such designations cannot] discriminate unfairly against any class so designated." 11 U.S.C. § 1122 provides that claims and interests may be classified in a particular class only if such claims or interests are "substantially similar." Reference to the legislative history makes clear that this section is a codification of current case law which requires "classification based on the nature of the claims or interests classified." H.R.Rep. No. 95–595, *supra* at 406. S.Rep. No. 95–989, *supra* at 118, U.S.Code Cong. & Admin. News, p. 5904. Citing cases under former law, which, according to

the aforesaid legislative history, are helpful in interpreting Section 1122 of the new Code, *Collier on Bankruptcy* concludes that "substantially similar" must be construed "to mean similar in legal character or effect as a claim against the debtor's assets or as an interest in the debtor." 5 *Collier on Bankruptcy* ¶ 1122.03, at 1122–4 (15th Ed. 1979). Thus, only debts which have identical legal rights in the debtor's (or the estate's) assets may be classified together. *Collier* implies by example that all allowed, non-priority, unsecured claims have *equal* right to *pro rata* distribution of assets after payment of secured and priority claims. *Id.* at 1122–5. This would comport with classification based on the legal nature of a claim, all unsecured creditors having similar right, absent some reason for equitable subordination, to the assets of the estate. The only apparent exception to a uniform classification of unsecured creditors, other than equitable subordination, is found in Section 1122(b) which codifies the "administrative convenience exception" developed by former case law. If the Court finds such designation to be reasonable and necessary for administrative convenience, this subsection allows a classification of unsecured claims based solely on the amount of the claim, a separate class being established for all claims less than a specified amount.

█ In light of the foregoing, Section 1122 appears not to allow a separate classification of an unsecured debt based solely on the presence of a codebtor. The existence of a codebtor does not change the nature of the debt itself nor does it alter that debt's position in respect to its claim on the debtor's assets. This interpretation is supported by Judge Lee, who points out that

the fact that the automatic stay against collection from co-debtors on consumer debts is operative only to the extent the plan proposes to pay the claim will probably have the salutary effect of encouraging 100 percent payment plans by debtors who are capable of carrying out such plans, and will limit the use of composition plans to debtors who cannot pay in

full and maintain a decent living standard for themselves and their families. Lee, *Chapter 13 nee Chapter XIII*, 53 Am. Bankr.L.J. 303, 313 (1979).

Further, as previously noted, Section 1322(b)(1) does not allow the plan to "discriminate unfairly against any class so designated." Where one unsecured creditor is paid 100 percent while the rest are paid nothing, solely because of a codebtor, and not because of any difference in the nature of the debt, this is an arbitrary classification which discriminates unfairly against the class receiving nothing. The same conclusion would be reached if the debtor proposed to pay the debt with the codebtor outside of the plan if, in fact, moneys which would have been available for payment under the plan are diverted to pay the debt outside of the plan. *See In re Jaco Fabrics, Inc.*, 3 B.C.D. 1301 (M.D.Ga.1978). This is not to say, however, that if the plan meets statutory requirements and is confirmed, and the debtor still has some excess income, he cannot use that excess to pay whatever debts he wishes, subject, of course, to the provisions of 11 U.S.C. § 524(c) concerning reaffirmation. Simply stated, general unsecured debts, which are of the same legal nature, must be treated fairly and equally under the plan.

Nevertheless, it may be argued with some practical force, that previous case law and present Chapter 11 restrictions ought not apply to Chapter 13 classifications. Unsecured creditors have no vote on the Chapter 13 plan and, therefore, "improper" classification does not compromise voting power as it may in Chapter 11. Furthermore, since there is arguably little obvious incentive or requirement that Chapter 13 debtors pay anything to unsecured creditors (assuming those creditors would receive nothing in Chapter 7 liquidation), any classification of unsecured creditors may result in at least payment to some creditors who otherwise might receive nothing. Finally, the objective of broad debtor's relief is compromised if separate classification of co-obligor debts is not allowed.

The acknowledged force of these arguments is, however, unpersuasive. Chapter 13 classification is tied directly to Chapter 11 classification restrictions by 11 U.S.C. §§ 1322(b)(1) and 1122 as noted earlier. This direct tie reflects a legislative intent to adopt existing classification restrictions and to provide some protection to the unsecured Chapter 13 creditor precisely because the creditor has no vote. This protection is particularly critical to the significant creditor of the Chapter 13 business debtor whose subordination to personal or business codebtor debts might effect a substantial injustice and, indeed, a future proclivity by lenders to demand a cosigner. The broad relief of Chapter 13 has its limits. Therefore, the Court now holds that an unsecured debt classified separately and treated differently solely on the basis of the existence of a codebtor is an improper classification under 11 U.S.C. § 1322(b)(1).

### *The Chapter 13 Requirement of Payment of Unsecured Claims*

The common issue presented by the cases now before the Court and meriting the major focus of this opinion is the payment requirement, if any, of the Chapter 13 plan. Initially, the Court addresses the question of whether a plan which proposes no payments may be confirmed, and if not, what standard must be met in respect to payments required for confirmation.

■ The requirements for confirmation are set out in 11 U.S.C. § 1325 which states in part:

(a) The court shall confirm a plan if . . .

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date . . .

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

The so-called "best interest of creditors test," embodied in Section 1325(a)(4), requires only that the unsecured creditors of the debtor receive at least as much as they would have received if the debtor had liquidated under Chapter 7. When all of the debtor's assets are exempt, as is the situation in each of the cases herein, compliance with this requirement would result when no payments were made at all. A careful examination of the legislative history and the other provisions of Chapter 13 demonstrates, however, that a plan without payments leaves much of the chapter without meaning and confirmation of such a plan vitiates the concept of Chapter 13.

For an individual to be entitled to file under Chapter 13, 11 U.S.C. § 109(e) requires that he have "regular income," as defined by 11 U.S.C. § 101(24). The clear expectation underlying this requirement is that the debtor use his future income to make payments to his creditors. Indeed, the legislative history discussed below shows this to be the *raison d'etre* of Chapter 13—to give debtors who have regular future income, out of which creditors can be paid, an alternative to liquidation by the partial or full payment of claims from future income.[1] If no payments are to be made out of future income, such a limitation on those eligible to file under Chapter 13 appears arbitrary.

11 U.S.C. § 1325(a)(6) requires, as a prerequisite to confirmation, that the debtor be able to make "all *payments* under the plan and to comply with the plan." (Emphasis added.) This section contemplates that some payments be made under a plan. Under the section, the Court is to determine whether the plan is feasible, *i. e.*, in light of the debtor's budget, whether the proposed payments can be made. It anticipates that the debtor live within a proposed budget to make such payments. One may reasonably conclude from this requirement for confirmation that if a debtor cannot feasibly make any payments under a plan, because the debtor has no excess income, then his "plan" cannot be confirmed, and he is left with the remedy of Chapter 7 liquidation. Indeed, an individual with regular income is one whose income is "sufficiently stable and regular to *enable* such individual to *make payments* under a plan . . . ." 11 U.S.C. § 101(24). (Emphasis added.) It may be argued that one whose income does not enable him to make payments under the plan does not have "regular income" within the statutory meaning. If the debtor has no excess income out of which to make payments, he is in practical effect no different from the debtor without regular income.

11 U.S.C. § 1326, entitled "Payments," contemplates by its terms that at least some payments will be made under the proposed plan. This is also true of 11 U.S.C. § 1325(b), which allows the Court to order after confirmation that the debtor pay "all or any part" of his income over to the trustee for disbursement.

The operation of 11 U.S.C. § 1328(b) and (c), which allow for a narrower, hardship discharge "to a debtor that has not completed payments under the plan," rests upon payments as an integral requirement for a confirmed plan. There is no purpose in allowing a hardship discharge if debtors may file plans proposing no payments, for a debtor need never fail to complete his payments if none are proposed. Further, under Section 1328(b), a hardship discharge, where the debtor is unable to make his payments, is no broader than under a Chapter 7 liquidation. It seems unlikely that Congress intended to grant the Chapter 13 debtor who does not attempt to repay his debts a more generous discharge than the debtor who tries, but fails. In fact, it follows

---

1. Payment of claims may also be made from property of the estate or of the debtor, if the plan so provides. 11 U.S.C. § 1322(a)(8). Nevertheless, the principal thrust of the Chapter 13 provisions is that payments be made from future income, regular income being the main prerequisite of Chapter 13 relief. However, the liquidation by the debtor of some of his assets may supplement future income. See text, *infra,* p. 263.

logically from the limited hardship discharge provision that before a debtor may have the advantage of the broader Chapter 13 discharge, he must both attempt repayment of unsecured debts, since the discharge of unpaid secured claims is not at issue, and succeed to some extent. Confirmation of a plan proposing no payments allows the debtor the broader discharge and offends this provision and its obvious intent. In summary, if the integrated provisions of Chapter 13 are to have meaning, payments must be required under a proposed plan.

The legislative history also reveals that Chapter 13 was devised and promulgated as a vehicle for the voluntary *repayment* of debts. The Commission Report, presented to the Congress and adopted in large measure by the Congress, based its recommendations for changes in Chapter 13 upon the testimony of witnesses at its hearings and upon correspondence to the effect that "the preponderant majority of debtors desire some means of *paying* their debts in preference to incurring the stigma and other consequences of bankruptcy." (Emphasis added.) Commission on the Bankruptcy Laws of the U.S., H.R.Doc. No. 93–137, 93rd Cong., 1st Sess., Pts. I and II 157 (1973). Based upon this finding, the Commission recommended an overhaul of former Chapter XIII to encourage those eligible to file under newly-cast Chapter 13. The Commission recommended use of the chapter be voluntary, although some had suggested that it be required before Chapter 7 relief be made available, for it felt that a Chapter 13 plan requires "not merely a debtor's consent but a positive determination by him and his family to live within the constraints imposed by the plan during its entire term and a will to persevere with the plan to the end." *Id.* at 159. This statement contemplated not only that some payments be made out of the debtor's future income, so as to require a voluntary budget, but also that the plan continue over some period of time. Such will not be the case under a no-payment plan, for it is completed as soon as it is begun. The Commission refers to Chapter 13 as an "opportunity to work out

a plan to *pay debts out of future income*" (emphasis added), and further states that Chapter 13 "does not require a debtor to propose to pay all of his debts," but allows a "composition or a combination of a composition and an extension." *Id.* at 159, 160.

New, more liberal provisions of Chapter 13 were proposed to encourage debtors to attempt repayment as it was concluded that this sort of arrangement "should be fostered" both for the benefit of the debtor and the creditors. Thus, 11 U.S.C. § 1322(b)(8) was proposed and passed which allowed debtors to *repay debts* with property as well as future income so as to make such plans feasible for more individuals:

> If composition is to be encouraged as an alternative to straight bankruptcy for debtors with regular income, the application of a debtor's nonexempt assets to reduce the amount of indebtedness to be payable out of future income should be authorized, and indeed the use of nonexempt assets may likewise be appropriate in a plan contemplating an extension without reduction of debts.

*Id.* at 164. The statement clearly differentiates between repayment under Chapter 13, which is the goal to be encouraged, and liquidation under Chapter 7.

More importantly, the proposal, and subsequent adoption of the discharge provisions of Chapter 13, which allow a much broader discharge than possible under Chapter 7, were based on the premise that debtors ought to be encouraged to repay their debts. The Commission said on this point:

> If the debtor wants to *pay* his debts pursuant to a plan, and if creditors are willing to go along, he should be allowed to do so. The fact that a discharge would not be available in a liquidation case should furnish a greater incentive for the debtor to perform under the plan. (Emphasis added.)

*Id.* at 175. It is apparent that a debtor who proposes to pay nothing under a Chapter 13 plan files a Chapter 13 only for the broader discharge. Such a benefit abuses the intended Chapter 13 relief.

Conclusions reached from the Commission's report and recommendations to Congress are reinforced by the Senate and House Reports on the subject. In beginning its analysis and recommendations as to changes to be made in the Chapter 13 structure and provisions, the Senate Report states:

> In theory, the basic purpose of Chapter XIII has been to permit an individual to pay his debts and avoid bankruptcy by making periodic payments to a trustee under bankruptcy court protection, with the trustee fairly distributing the funds deposited to creditors until all debts have been paid.

S.Rep. No. 95–989, *supra* at 12, U.S.Code Cong. & Admin. News, p. 5798. The House Report states with even greater clarity:

> In the consumer area, proposed chapter 13 encourages more debtors to repay their debts over an extended period rather than to opt for straight bankruptcy liquidation and discharge.

H.R.Rep. No. 95–595, *supra* at 5, U.S.Code Cong. & Admin. News, p. 5966. Later, the House Report is again unmistakable:

> The purpose of chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period.

*Id.* at 118, U.S.Code Cong. & Admin. News, p. 6079. The Report reasons that the flexible and liberal provisions of the new Chapter 13 are to encourage debtors first to attempt repayment, if possible, and then to resort to Chapter 7 liquidation, if repayment is not possible. *Id.* at 118. These statements make clear that Chapter 13 was designed for *repayment* and is to be differentiated from the liquidation process under Chapter 7.

Under the subheading of "The Plan," the House Report states that "the plan may provide for full or partial payment of creditors, over a period of up to three years . . . ." *Id.* at 123, U.S.Code Cong. & Admin. News, p. 6084. It says nothing about a plan which proposes no payments. The Senate Report's explanation of the new Chapter 13 similarly contemplates only debt repayment:

> Chapter 13 is designed to serve as a flexible vehicle for the repayment of part or all of the allowed claims of the debtor.

S.Rep. No. 95–989, *supra* at 141, U.S.Code Cong. & Admin. News, p. 5927. Further comments in the Senate Report state:

> The new chapter 13 will permit almost any individual with regular income to propose and have approved a reasonable plan for debt repayment based on that individual's exact circumstances.

*Id.* at 13, U.S.Code Cong. & Admin. News, p. 5799. Clearly, payments were contemplated under Chapter 13.

The payments contemplated by the statute and its proponents are to creditors holding unsecured claims. Holders of secured claims receive similar protection under Chapter 7 and Chapter 13. *Compare, e. g.,* 11 U.S.C. § 363(e) (applicable in Chapters 7 and 13) *with* 11 U.S.C. § 1325(a)(5) (applicable in Chapter 13). If the payments referred to in the statute, and so frequently in Chapter 13 history, as earlier discussed, meant payments on secured claims, then those payments required under Chapter 13 would be essentially the same as those required under Chapter 7. Such an interpretation would disregard the premise upon which Chapter 13 is based. It would be anomalous, for example, for proponents to recommend, and for Congress to enact, the incentives which encourage Chapter 13 filings if the payments thereby promoted were similar payments on secured claims as required under Chapter 7.[2] Chapter 13 does

---

2. It is true that Chapter 13 allows the extension of secured claims under 11 U.S.C. § 1325(a)(5)(B)(i) and (ii) and these extension payments may be seen as different from payments made under Chapter 7. However, arguably, a Chapter 7 debtor might be able to extend secured payments on otherwise exempt property upon a showing of adequate protection. *See* 11 U.S.C. §§ 363(e), 722. Indeed, the Chapter 13 debtor's payments under Section 1325(a)(5)(B)(ii) arguably must be sufficient to keep the secured creditor adequately protected during the term of the plan. In any event, the context of the "payments" discussed in the text

not allow the confirmation of a plan which proposes no payments on unsecured claims.

The statute is an effort to promote payments to unsecured creditors to the benefit of debtors and creditors alike. "Partial repayment" of unsecured debts under Chapter 13 is preferable to almost certain nonpayment of those debts in "straight bankruptcy" where "both the debtor and his creditors are the losers." H.R. Debates, 123 Cong.Rec. H11690–92, H11696–710 IV–12 (daily ed. October 27, 1977). Chapter 13 succeeds if incentives to the debtor are adequate and demand for payments is not excessive. The incentives to the Chapter 13 debtor discussed earlier are substantial. Excessive demands for payment are prevented by eliminating the unsecured creditor's right to vote against the plan in exchange for the assurance, at 11 U.S.C. § 1325(a)(4), that the creditor will receive at least as much as would have been paid under Chapter 7. The creditor's right to vote on the plan is eliminated under these circumstances since "if the debtor makes an effort to repay his creditors, the creditors should not be able to say that the plan does not propose to pay enough or that it does not do other things that the creditors want." *Id.* at IV–12. Excessive demands by creditors for payment are convincingly eliminated under the statute.

The almost total absence of creditor payment demand, however, leaves Chapter 13 out of balance. Debtors are encouraged to *file* under Chapter 13, but creditors are virtually powerless to encourage or require payments under Chapter 13.[3] It is the Court which is now called upon by the statute to impose a flexible requirement of payment on unsecured claims and thereby establish the equilibrium within Chapter 13

which is required by both external and internal statutory analysis.

### *"Good Faith" Effort to Make Meaningful Payments*

11 U.S.C. § 1325(a)(3) requires the Court to find that the plan is proposed in "good faith." The requirement of "good faith" stands alongside the requirement in 11 U.S.C. § 109(e) that the debtor have regular income, and the requirement in § 1325(a)(4) that unsecured claims receive as much as they would have received under a Chapter 7 liquidation, which in all of the cases now before the Court would be zero. Although the words "good faith" are found in § 651 of the Bankruptcy Act, former 11 U.S.C. § 1051, where they formed the requirement that acceptances of a Chapter XIII plan were procured fairly, the phrase apparently attracted no interpretive gloss. The Section 1325(a)(3) requirement of good faith, as no specific historical guidance is given respecting its intended interpretation, may be given meaning by a review of the general legislative history of the chapter and the interaction of the Chapter 13 provisions as a whole. It can be deduced from the Commission Report, which recommended the proposed legislation, that the "good faith" requirement was meant to be given substance, particularly in light of the broader Chapter 13 discharge, so as to protect the rights of unsecured creditors:

> If the plan is "in the best interest of creditors" *and* has been proposed in "good faith," the fact that the debtor may not be eligible for a discharge in straight bankruptcy should not prevent confirmation of a plan of payment from future earnings, and the Commission accordingly recommends omission of any such limitation. (Emphasis added.)

convince the Court that payments on unsecured claims are intended.

**3.** One provision, 11 U.S.C. § 727(a)(9), was intended to encourage the debtor to make payments under his plan. If 70 percent to 100 *percent of the debtor's unsecured claims* are paid under the plan, a discharge of subsequent debts may be obtained under Chapter 7 without waiting six years. This provision did not win the compliance of the debtors presently before

the Court nor, it may be assumed, will it influence many debtors since future bankruptcy for future debts is not usually in contemplation of the debtor. Furthermore, if the debtor cannot pay at least 70 percent of his unsecured claims, this provision provides no incentive to attempt *substantial repayment of 69 percent of the* claims or less. See further discussion of Section 722 at note 4, *infra*, and accompanying text.

Commission on the Bankruptcy Laws of the U.S., *supra* at 163. To be entitled to the broader discharge, both the requirements of Section 1325(a)(4) and Section 1325(a)(3) must be met. Further, the Commission's contemplation of the role of "good faith" in requiring some effort by debtors and in protecting unsecured creditors is obvious in its statement that

> The Act should not *require* such application of the non-exempt assets to the immediate payment of debts, however, except insofar as such application may be deemed necessary by the administrator or by the court to meet the statutory standards of the "best interest of creditors" *and* "good faith." (Emphasis added.)

*Id.* at 164. The Commission report implies that the "good faith" requirement, 11 U.S.C. § 1325(a)(3), as well as the "best interests of creditors" test, 11 U.S.C. § 1325(a)(4), sets a standard for the amount of payments to be required for confirmation of a plan. Thus, the "good faith" requirement carries a substantive content which affects the effort and payments on unsecured claims required for confirmation of a plan independent of the "best interest of creditors" test. Secured creditors are, of course, provided for independent of the "good faith" and "best interest of creditors" requirements by 11 U.S.C. § 1325(a)(5) which provides the debtor with three choices from which to deal with the secured creditor.

Taking into consideration the Commission's statements and other legislative history which dictate a finding that a plan proposing no payments to unsecured creditors cannot be confirmed, how much must be paid under the plan to holders of unsecured claims to meet the requirement of a "good faith" proposal? A review of the purposes and provisions of Chapter 13 as a whole and of the express legislative intent provide the Court with significant insight into the appropriate interpretation of this requirement.

A study of the legislative history reveals that the proponents of the Chapter 13 provisions intended and projected that a sub-

stantial amount would be paid out under all proposed plans. In citing the reasons for the changes to be made in the Chapter 13 provisions, the House Report criticized the former Chapter XIII as being "overly stringent and formalized" which "discouraged overextended debtors from attempting to arrange a repayment plan under which all creditors are repaid most, if not all, of their claims over an extended period." (Emphasis added.) H.R.Rep. No. 95–595, *supra* at 117, U.S.Code Cong. & Admin. News, p. 6077. Thus, in reworking the Chapter 13 provisions, proponents were attempting to produce a medium for repayment of "most, if not all" of the claims against the debtor. Further, in proposing the "best interest of creditors" requirement, embodied in Section 1325(a)(4), as a replacement for the unsecured creditors right to vote on the plan, the House Report stated:

> Under present law, the consent requirement often prevents a debtor from making a legitimate offer of less than full payment, for fear that the offer will not obtain the requisite consents. . . .
> The bill requires only that creditors receive under the plan *more* than they would if the debtor went into straight bankruptcy. (Emphasis added.)

*Id.* at 123, U.S.Code Cong. & Admin. News, p. 6084. The legislature intended Chapter 13 to be employed for "legitimate" or "good faith" offers of repayment of unsecured claims and further contemplated that the debtor would pay more than required under straight bankruptcy. It seems reasonable to conclude, although there is no available material on the matter, that the wording of Section 1325(a)(4) requiring "not less than" the amount that would be received under a Chapter 7 liquidation, rather than "more than" which appears to be the intent by terms of the House Report, may be so as not to force a debtor who would be able to distribute 100 percent payment under Chapter 7 to pay more than 100 percent under Chapter 13 as well as to impose a firm minimum upon which a flexible "good faith" requirement for additional payments could be based. Thus, as is set out in the Commission Report, the assurance that this

"more than" standard would be reached in appropriate cases was left to the requirement of a "good faith" proposal, which requirement serves as a supplement to the "best interest of creditors test" to insure reasonable offers of repayment. The plans summarized herein make obvious the need for such an additional requirement. The Senate Report confirms the legislative intent that a "reasonable plan for debt repayment" be made. S.Rep. No. 95–989, *supra* at 13, *infra*, p. 13. The intent seems clear that for confirmation to be granted, the plan must propose a legitimate or substantial repayment of unsecured claims depending, of course, on the individual's particular situation.

Debtors, who are able, are encouraged by the statute to pay 100 percent or at least 70 percent of their unsecured debts because of the otherwise effective limitation on the availability of a subsequent discharge under 11 U.S.C. § 727(a)(9) in case of repetitive financial crises. Section 727(a)(9) allows a discharge under Chapter 7 to be granted a debtor within six years after the granting of a discharge in Chapter 13 only if 100 percent of the allowed unsecured claims were paid under the plan, or at least 70 percent of such claims were paid and the plan was proposed in good faith *and* was the debtor's best effort. This was clearly meant as an incentive for high repayment plans. The Senate Report states:

> As in current law, 100 percent payment plans will be encouraged by the limitation on availability of a subsequent discharge in § 727(a)(8) [sic]. . . . *It is also necessary to prevent chapter 13 plans from turning into mere offers of composition plans under which payments would equal only the non-exempt assets of the debtor.*

S.Rep. No. 95–989, *supra* at 13, U.S.Code Cong. & Admin. News, p. 5799. (Emphasis added.) The existence of this "best effort" standard in § 727(a)(9), but not in Chapter 13, seems to indicate that best effort is not required for confirmation of every plan as

is a "good faith" proposal for the repayment of unsecured debts. The statute itself in Section 727(a)(9)(B)(ii) differentiates between the requirement of "best effort" and the requirement of "good faith." Both are necessary for allowance of subsequent Chapter 7 discharge. The "best effort" requirement of Section 727(a)(9) is an incentive only to those debtors who can pay 70 percent or more of their allowed unsecured debts. For the debtor who cannot pay at least this much, this section provides no incentive. Thus, "to prevent chapter 13 plans from turning into mere offers of composition plans under which payments would equal only the non-exempt assets of the debtor," the debtor must always meet the standard of a "good faith" proposal, which, in light of Section 727(a)(9), requires something less than "best effort," and, in light of the foregoing analysis, may be defined as a good faith effort to make meaningful payment to holders of unsecured claims.

By necessity, such a good faith effort must be interpreted equitably and flexibly. The following factors may be considered in determining whether a good faith effort to make meaningful payment to holders of unsecured claims has been made:

1. The budget of the debtor, *i. e.*, how much the debtor feasibly can pay.[4]

2. The future income and payment prospects of the debtor.

3. The dollar amount of debts outstanding, and the proposed percentage of repayment.

4. The nature of the debts sought to be discharged; specifically, to what extent the debtor is invoking the advantage of the broader Chapter 13 discharge which may carry with it concomitant obligations of repayment effort.

As seems intended by the flexible standard of "good faith," discretion is to be left with the court to insure that all parties are treated fairly. The "good faith" re-

---

**4.** The element of ability to pay was explored in the floor debates at 124 Cong.Rec. H11,098 (Sept. 28, 1978); S17,415 (Oct. 6, 1978). The context was the determination under 11 U.S.C. § 727(a)(9) of "best efforts." Effort is also important to a determination of "good faith."

quirement must be applied in light of the intent of Congress to increase both the availability of Chapter 13 relief and the repayment received by creditors. A proposal of meaningful repayment must be made, in light of the debtor's particular circumstances, even, when, as in these cases, all of the debtor's assets are exempt. If no meaningful repayment can be proposed, the debtor is not entitled to Chapter 13 relief. This flexible, equitable standard of Section 1325(a)(3) is not foreign to the bankruptcy law. As aptly stated by Justice Douglas in *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966), in a similar context:

Yet we do not read these statutory words with the ease of a computer. There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction.

The Court's interpretation of "good faith" as used in Chapter 13 follows no traditional bankruptcy meaning of the phrase; neither is this interpretation meant to apply nor can it logically extend, to any similar phrase elsewhere in the law. The Court's interpretation of the Chapter 13 "good faith" requirement is made within the context of Chapter 13 and is based solely upon the legislative history and statutory environment of Chapter 13.

A final requirement for the Court's interpretation of Section 1325(a)(3) "good faith" is imposed by administrative necessity. The trustee must expend significant initial effort in preparing the no, or small payment cases, and no matter how small the payments, a minimum effort is required in disbursing such payments. Unlike under Chapter 7, where a portion of the filing fee is remitted to the trustee, compensation under Chapter 13 comes solely from a percentage of the funds disbursed. A meaningful amount must be paid under the plan to allow the trustee feasibly to provide advice to debtors, disbursements to creditors and reports and recommendations to the Court as required by 11 U.S.C. § 1302(b).

Naturally, in keeping with the nature of the Court, the initial burden of insuring that this "good faith" requirement is met in each case should rest primarily with the trustee and other parties in interest who have the opportunity to examine the debtor during the meeting of creditors held under 11 U.S.C. § 341. They should advise the Court as to whether the plan can, and ought to be, confirmed as having met the requirements of Section 1325. If a party in interest does not believe the "good faith" requirement of Section 1325(a)(3) has been met, that party may object to confirmation under 11 U.S.C. § 1324. Absent objection, the Court shall nevertheless determine the plan's compliance with the requirements of 11 U.S.C. § 1325 including the requirement of "good faith."

### ORDER

Confirmation of the plans proposed in each of these cases is denied on the following grounds:

1. Failure to comply with 11 U.S.C. § 1325(a)(3) which requires a good faith effort to make meaningful payments to holders of unsecured claims.

2. *In re Matern, In re Epperson* : Improper classification under 11 U.S.C. § 1322(b)(1) which prohibits the separate classification of unsecured claims based upon the presence or absence of a codebtor.