**In re Richard A. DALBY, Debtor.**

**Bankruptcy No. 82C–02533.**

United States Bankruptcy Court,
D. Utah.

Feb. 20, 1984.

Judith A. Boulden, Salt Lake City, Utah standing Chapter 13 trustee.

Richard Calder, Salt Lake City, Utah, for debtor.

Bill L. Walker, Asst. Atty. Gen. State of Utah, Salt Lake City, Utah, for creditors Student Loan Center, University of Utah and Utah Educational Loan Services, Inc.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

This Chapter 13 case requires the court to apply the standards for determining good faith under 11 U.S.C. § 1325(a)(3) established in *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983).

Debtor is a library assistant. He is married, but lives apart from his wife and two children. Debtor presently earns $382.00 take-home pay every two weeks. He has had his present job since June 1, 1982. His gross income for 1981 was $300.00.

Debtor's plan proposes to submit $125.00 per month for 36 months to the standing Chapter 13 trustee to fund the plan. There are no secured claims. The plan proposes to pay the administrative claimants a total of $1,151.38. Debtor has five unsecured creditors with the following claims totaling $10,658.00:

1. University of Utah Student Loan Service Center (National Defense Student Loan) $9,618.00
2. First Security Bank (Student Loan) 650.00
3. Salt Lake Schools Credit Union (Loan) 260.00
4. Auerbach's Department Store (Credit Card Purchases) 130.00
5. Robert L. Sorbonne, D.D.S. (Contingent Dental Bill) .00

Student loans comprise 96 per cent of the unsecured claims; the plan will pay 30 percent of each unsecured claim.

Debtor's schedules list the following assets for a total of $627.00: $7.00 cash on hand; $40.00 cash on deposit; $10.00 radio; $20.00 utensils, cookware, pots, pans, dishes; $100.00 books and encyclopedias; $200.00 wearing apparel; $150.00 car; $100.00 wages earned but not paid. Debtor claims $330.00 of these items as exempt property.

Debtor's budget lists the following monthly expenses:

| | |
|---|---|
| Rent | $100.00 |
| Utilities | 20.00 |
| Food | 75.00 |
| Clothing | 15.00 |
| Laundry | 5.00 |
| Newspapers, periodicals, books | 5.00 |
| Medical and drug | 10.00 |
| Car Insurance | 16.00 |
| Transportation | 60.00 |
| Recreation | 10.00 |
| Informal Child Support | 200.00 |
| Total | $516.00 |

After subtracting expenses and the $125.00 payment to the plan, debtor's monthly excess will be $186.66, calculated as follows:

| | |
|---|---|
| Monthly Take Home Pay | $827.66 |
| Less: Expenses | −516.00 |
| Surplus | 311.66 |
| Less: Plan Payment | −125.00 |
| Excess | $186.66 |

On March 30, 1983, a confirmation hearing was held on debtor's plan. Two student loan creditors objected to confirmation on the ground that the plan "fails to meet the 'good faith' requirements of § 1325(a)(3) because [debtor] seeks to use Chapter 13 primarily to discharge 523(a) debts which is a purpose for which Congress did not intend Chapter 13 to be used."

Creditors rely on *In re Smith*, 8 B.R. 543 (Bkrtcy.D.Utah 1981), which denied confirmation of a Chapter 13 plan proposing to pay 16 percent of unsecured claims, 66 percent of which were student loans. Although creditors argue that "[t]here are no factors in the present case which distinguish it from the *Smith* case," the court finds that there are significant differences.

In some respects, this plan has a better chance of confirmation than the plan in *Smith*. It is six months longer than the 30 months proposed by Smith's plan. It proposes to repay nearly twice as much unsecured debt, expressed as a percentage to be repaid, than did the plan in *Smith*. The debtor in *Smith* proposed to repay 16 percent of unsecured debt; debtor in this case proposes to repay 30 percent.

On the other hand, some aspects of this plan make it less desirable, at least from a creditor's viewpoint, than the plan in *Smith*. The percentage of debt represented by nondischargeable student loans is 30 percent higher in this case than in *Smith*. Student loans represented 66 percent of Smith's unsecured debt; they constitute 96 percent of Dalby's. Whereas Smith proposed to dedicate 79 percent of his monthly surplus to the reduction of unsecured debt, Dalby proposes to apply 40 percent. Consequently, even though *Smith* is in some respects similar to the present case, it is not controlling.

In *Flygare v. Boulden, supra,* the Tenth Circuit Court of Appeals held that no single factor in a Chapter 13 plan is dispositive of the issue of good faith under Section 1325(a)(3). 709 F.2d at 1346–47. The court cited *In re Estus*, 695 F.2d 311, 315–16 (8th Cir.1982), for the proposition that "a finding of good faith requires an inquiry, on a case-by-case basis, into whether the plan abuses the provisions, purpose or spirit of Chapter 13." 695 F.2d at 315. The court directed bankruptcy courts to judge each case on its own unique facts and circumstances, adopting from *In re Estus* the following factors as relevant to but "not exhaustive" of a determination of good faith:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee.

In considering the student loan creditors' assertion that Dalby's proposed plan "fails to meet the 'good faith' requirement of § 1325(a)(3)," the court makes the following findings in accordance with the conceptual framework prescribed by the Tenth Circuit:

By way of introduction, the court finds that only factors (1), (2), (3), and (7) are of particular relevance to this case.

### (1) THE AMOUNT OF THE PROPOSED PAYMENTS AND THE AMOUNT OF THE DEBTOR'S SURPLUS

■ In addressing the amount of the proposed payments, both the amount paid and the percentage of unsecured debt to be repaid are relevant. The amount of debt to be paid is $3,197.40. The percentage of unsecured debt to be paid is 30 percent. In terms of a percentage of unsecured debt,

Dalby's proposal exceeds others *Flygare* cited approvingly. In *Flygare,* a proposal of 3 percent was found not to be a per se indication of bad faith. 709 F.2d at 1345, 1348. Moreover, the Tenth Circuit referred approvingly to *Goeb v. Heid (In re Goeb),* 675 F.2d 1386 (9th Cir.1982), where the court found that a proposal for only a 1 percent repayment to unsecured creditors was not per se evidence of bad faith. Dalby's proposal to repay 30 percent is far in excess of these percentages. But a 30 percent repayment figure is not per se acceptable merely because it exceeds the percentages in *Flygare* and *Goeb.* Similarly, the "amount of the debtor's surplus" refers both to the size of the surplus and to the percentage of income retained by the debtor. This recognition is supported by the Tenth Circuit's analysis: "The plan showed ... a surplus of $110 per month. From that the Flygares proposed to make payments under the plan of $106 per month ...." *Supra* at 1348 n. 3. The Flygares therefore proposed to dedicate 96 percent of their monthly surplus to payment of unsecured debt. Immediately following its reference to the Flygares' surplus, the court also cited *In re Goeb, supra,* for further illustration of an acceptable dedication of surplus income to a Chapter 13 plan. The debtors in *Goeb* proposed to dedicate 100 percent of their monthly surplus to unsecured creditors.

Although the court subtracted $1,720.00 in expenses from $1,840.00 in take-home pay, a difference of $120.00, it referred to a surplus of $110.00. A $106.00 monthly payment is 88 percent of $120.00 and 96 percent of $110.00. Because the court specifically used the $110.00 figure, this court has used 96 percent as the percentage of surplus in *Flygare* for purposes of analysis in this case.

Similar conclusions were reached in other cases cited in *Flygare.* In *Deans v. O'Donnell (In re Deans),* 692 F.2d 968 (4th Cir.1982), the court found a plan dedicating 93 percent of the debtor's monthly surplus

to be confirmable. *Barnes v. Whelan*, 689 F.2d 193 (D.C.Cir.1982) approved confirmation of plans proposing to dedicate 100 percent of debtors' surplus income to debt reduction.[1]

*Flygare's* footnote 3 contrasts *Goeb* and *Flygare* to *In re Tanke*, 4 B.R. 339 (Bkrtcy.D.Colo.1980), where the debtor had a monthly surplus of $901.65 "yet proposed to pay *only* $160.00 per month" (emphasis added). By referring to a payment of "only $160.00 per month," *Flygare* suggests that a debtor's proposal to pay 40 percent of surplus income may not demonstrate good faith.

The dedication of even a large percentage of a debtor's surplus income to a Chapter 13 plan has not uniformly resulted in confirmation. In *In re Estus, supra,* the debtors had a monthly surplus of $253.00 and proposed to disburse 99 percent to the trustee. The court reversed the order of confirmation because the plan ran for only 15 months, because the plan included educational debts not dischargeable in Chapter 7 and because the plan ignored future income increases.[2]

■ Dalby's proposal to disburse only 40 percent of his monthly surplus to the trustee therefore weighs against confirmation of the plan. Debtor has shown no reason why the 93 percent distribution in *Deans,* the 96 percent distribution in *Flygare,* the 99 percent distribution in *Estus* or the 100 percent distribution in *Goeb* and *Barnes* could not similarly be proposed in this case.[3]

## (2) THE DEBTOR'S EMPLOYMENT HISTORY, ABILITY TO EARN AND LIKELIHOOD OF FUTURE INCREASES IN INCOME

■ Creditors argue that "the debtor in this case has prospects of an increased income for the future. With debtor's strong academic background [a cum laude B.A. degree] and masters degree in English, it is not too speculative to assume that debtor within the period of this plan will change jobs or pursue a much more lucrative career." Creditors also point to future salary adjustments debtor may receive.

Creditors' argument that debtor may receive cost of living salary increases has little force because these increases are, presumably, offset by corresponding increases in the cost of living. The creditors' contention regarding debtor's ability to earn is more persuasive. The debtor's plan anticipates that his disposable income of $827.66 per month will not increase over the plan's three year period. *Flygare* mandates a simultaneous view of earning capacity and employment history. Debtor's salaried income is meager. His Chapter 13 statement at question 2(d), however, creates the impression that debtor's present job is his first. If this is his first job, it is remarkable in light of his receipt of a Bachelor of Arts degree in 1964. Assuming a typical age at graduation of 22, debtor's present age would be approximately 40.

*In re Kitchens, supra,* note 1, is an example of a plan confirmable even though unsecured creditors would receive nothing under the plan because of the debtor's inability to earn: "The case at bar involves 'exceptional circumstances' ... because the

1. The Tenth Circuit cited two additional cases. *Kitchens v. Georgia Railroad Bank* (*In re Kitchens*), 702 F.2d 885 (11th Cir.1983), provides no information on the debtor's available surplus. The court in *Ravenot v. Rimgale* (*In re Rimgale*), 669 F.2d 426 (7th Cir.1982) remanded because, among other reasons, the debtor's calculation of his monthly surplus was suspect. *Id.* at 432 n. 19.

2. One reason for the reversal in *Estus* was the short, 15 month, term of the plan. The two cases cited in *Flygare* as examples of the absence of per se bad faith, *Flygare* and *Goeb,* both provided for high percentages of the debtor's surplus to be paid out over five years.

3. In reaching this conclusion the court does not intend to imply that an application of surplus in excess of 90 percent either is a per se requirement, or that an application of less than 90 percent raises a presumption against the debtor. For example, a plan could provide for 100 percent payment of debts over a three year to five year period, but allocate far less than 90 percent of the debtor's surplus income. Such a plan might be confirmable under *Flygare.*

debtor [a totally disabled 56-year-old mother of seven], to save her home from foreclosure, is proposing to pay off the taxes, pay off her secured creditors or allow them to maintain their security ... Her plan runs nearly five years ... No creditors will receive less than they would have in a liquidation ...." 702 F.2d at 889 (quoting, *In re Bellgraph*, 4 B.R. 421, 423–24 (Bkrtcy.W.D.N.Y.1980)).

Debtor can earn at least the amount proposed in his plan. He could well earn far more. There is no exceptional reason to justify debtor's proposal to dedicate only 40 percent of his surplus to his plan while repaying only 30 percent of his unsecured debt.

### (3) THE PROBABLE OR EXPECTED DURATION OF THE PLAN

█ Debtor's plan refers to 36 payments of $125.00 but actually would result in 34 payments of $125.00 and one of $98.78.[1] If the debtor paid 100 percent of his $311.66 monthly surplus to the trustee over three years, he would pay $934.94 in trustee's fees, $210.00 in attorney's fees and $579.00 in tax claims, leaving $9,495.81 for unsecured creditors.

On the other hand, debtor could have proposed a 60 month plan providing for trustee's fees of $1,040.59, attorney's fees of $210.00 and tax claims of $579.00, with full repayment of unsecured claims. This plan would required payments of $208.13 per month, 67 percent of this surplus. Such a plan would still leave debtor with a monthly surplus of $103.53. This illustrates the fallacy of establishing a per se rule with respect to an allocation of surplus income. The proposed application of surplus income must be viewed in conjunction with the plan's duration.

The Tenth Circuit implies that five year plans may indicate good faith. *Supra*, at 1346 n. 1. The two confirmable plans with low payments to creditors, *Flygare* and *Goeb*, both involved five year plans. Consequently, the court finds that in view of the low payments to creditors and high surplus to debtor in this plan the 35 month duration of this plan weighs against its confirmation.

### (7) THE TYPE OF DEBT SOUGHT TO BE DISCHARGED AND WHETHER ANY SUCH DEBT IS NON–DISCHARGEABLE IN CHAPTER 7

Under Section 523(a)(8), subject to two exceptions, educational loans are not dischargeable. Under Chapter 13, however, all debts except alimony, maintenance and child support, and long-term debt where the "last payment is due after the date on which the final payment under the plan is due" are discharged by full performance of a plan. *Smith, supra*, noted: "Not all long-term debts are entitled to be excepted from discharge ... but only those debts which the debtor wishes to continue treating as long term debts. The court has no power to force the debtor to treat any specific debt as a long-term debt as a condition to confirming its plan." at 547.

█ Because debtor does not propose to treat his educational loans as long term debts, they are dischargeable in Chapter 13. On the other hand, debtor's educational loans would not be dischargeable in Chapter 7 (transcript of March 30, 1983 hearing at 4, 9) due to the operation of Section 523(a)(8)(A). On similar facts, the *Estus* court noted that an attempt "to discharge a student loan which is not dischargeable in chapter 7" may reveal an "apparent lack of good faith." 695 F.2d at 317.

Creditors argue this case should receive per se treatment because the educational loans represent 96 percent of debtor's indebtedness. The court rejects this per se approach, but finds the magnitude of debtor's educational debt clearly to be a factor weighing against confirmation in this case.

---

**4.** The trustee's fees of $362.38 are calculated on a total payment of $3,986.40, resulting in a total funding of $4,348.78.

In weighing factors (1), (2), (3) and (7) the court has kept in mind that "Congress never intended, of course, that chapter 13 serve as a haven for debtors who wish to receive a discharge of unsecured debts without making an honest effort to pay those debts." *Estus, supra* at 316 (quoting, *Deans, supra* at 972).

The "honest efforts" applauded by *Estus* are absent when a debtor proposes to retain $186.66 of his $311.66 monthly surplus. The situation is aggravated further in this case by the non-dischargeability of 96 percent of the underlying debt in Chapter 7.[5]

As recently noted by another court, Congress created Chapter 13 to give debtors the "opportunity to avoid the stigma attached to straight bankruptcy, [and to] protect their credit standing better than in liquidation." *In re Weyand*, 33 B.R. 553, 557 (Bkrtcy.D.Colo.1983). It would be inequitable for the debtor in this case to reap these advantages while forcing the very creditors who have assisted him to improve his status and who have gambled that he would, to forsake an uncontested debt merely because the debtor would prefer to liquidate that debt at 30 cents on the dollar.

Application of the factors enumerated by the Eighth Circuit in *Estus* and adopted in *Flygare* is not inconsistent with *In re Iacovoni*, 2 B.R. 256 (Bkrtcy.D.Utah 1980). Indeed, *Iacovoni* was one of the four cases cited by the *Estus* court as the sources for its factors. *Iacovoni*, like *Flygare*, requires a balancing approach. *Iacovoni's* requirement of thoughtful balancing was recognized by the court in *Bellgraph*, a case relied on in both *Kitchens* and *Estus* as providing a proper good faith analysis:

Judge Mabey of the Utah District in *In re Iacovoni*, 2 B.R. 256, 5 Bankr.Ct. Dec. 1270 (Bkrtcy.D.Utah 1980), outlined the legislative history of Chapter 13 and set forth certain factors that Judge Mabey says must be considered before a Bankruptcy Judge confirms the plan. These factors are the budget of the debtor, the amount the debtor can feasibly pay, the future income and payment prospects of the debtor, the amount of the outstanding indebtedness, the percentage of repayment and the nature of the debts being discharged.

In most cases, an analysis of these factors will show whether or not the debtor is making a sincere, meaningful, honest effort to pay his creditors. If no sincere, meaningful, honest effort is being made to pay the creditors, but the debtor is merely trying to put himself within the purview of the law and to pay the least that may be paid under the test of best interest without any consideration of "good faith," the plan should not be confirmed....

Congress' failure to define "good faith" is a mandate to the bankruptcy judges to review each case on its merits and to confirm only those cases which in view of the factors defined by Judge Mabey, *supra*, measure up to the Courts' sense of what is equitable in a given case. The approach must and should be a flexible one. There should be no exact percentage payment that will insure confirmation. Each case must be decided on its own merits.

*Bellgraph, supra* at 423.

■ Creditors' objection to confirmation is sustained. The holding in this case is narrow: This debtor's 35 month plan proposing to pay 30 percent of unsecured debt by applying only 40 percent of the debtor's monthly surplus to a debt that is 96 percent nondischargeable in Chapter 7 is not proposed in good faith.

The court recognizes that the "super effort" noted by *Bellgraph*, 4 B.R. at 424, may not always be possible. Too much financial straining can lead to a debtor's herniation. At the same time, however, the Code contemplates that a debtor will at

---

**5.** A recent case indicates that the filing for Chapter 13 relief "for the distinctly primary, if not sole, purpose of extinguishing" debts not dischargeable in Chapter 7 raises questions concerning the "motivation and sincerity of the debtor." *In re Chura*, 33 B.R. 558, 560 (Bkrtcy. D.Colo.1983). Because a consideration of factors (1), (2), (3) and (7) is sufficient to deny confirmation in this case, the court finds it unnecessary to address factor (10).

least perspire in order to merit the "fresh start" it affords debtors. The court has alluded above to hypothetical plans that might be confirmed, but it realizes there are others. It is now up to the debtor to propose one of them.