694 So.2d 784 (1997)
FIRST NATIONAL BANK OF LAKE PARK, Appellant/Cross-Appellee,
v.
Luella GAY, as Trustee of the Charles L. Gay and Luella Gay Trust, Appellee/Cross-Appellant.
No. 95-1231.
District Court of Appeal of Florida, Fourth District.
May 7, 1997.
Rehearing, Rehearing, Certification of Question and Certification of Conflict Denied June 10, 1997.
*786 Kathleen J. Loggins of Gibson & Adams, P.A., West Palm Beach, for appellant/crossappellee.
Richard H. Gaunt, Jr. of Gaunt, Pratt, Radford & Methe, P.A., West Palm Beach, for appellee/cross-appellant.
Rehearing, Rehearing En Banc, Certification of Question and Certification of Conflict Denied June 10, 1997.
WARNER, Judge.
This appeal arises from a final judgment in favor of a lessor on an action involving a breach of a commercial lease. Appellant, First National Bank, as lessee, claims that the trial court erred in requiring it to elect its remedy on the day of trial, in failing to give a jury instruction on "best efforts," in excluding evidence regarding conditions of the contract, and in refusing to have a question on the interrogatory verdict form as to appellant's affirmative defenses to appellee's counterclaim. We agree with appellant's contentions and reverse.
In September 1989, appellee Gay, as lessor, and appellant/lessee entered into a commercial lease for property to be used as a bank branch office. The lease of the current tenant, Barnett Bank, was to expire October 31, 1992, with First National's five year lease to commence November 1, 1992. The parties agreed in a provision of the lease to use their best efforts and reasonable diligence to induce Barnett to terminate the lease early. First National made several efforts to this end, and Gay testified that she also made some phone calls. After obtaining the Barnett lease in discovery, First National argued that a provision of the Barnett lease provided for the lessor's option to terminate the lease if Barnett ceased to operate the premises as a commercial bank. Barnett vacated the premises in December 1989 but continued to pay rent to Gay until the normal expiration of the lease.
While the lease between First National and Gay did not contain any provision which provided for the restoration of the premises to their original condition prior to First National's occupancy, First National sought to introduce parol evidence that Gay had advised First National that Barnett had the obligation to restore the property to its original condition, and that when asked what that condition was, she showed the bank officers floor plans representing the interior configuration of the property prior to its use as a bank. Letters between the parties were also proffered to show that the property was to be restored to its original condition when delivered.
In addition, when the lease was signed there was a roof-top sign bolted to the building. First National claimed that this was of material significance to it in entering into the lease. However, Barnett cut down the sign before its lease expired, arguing that it had belonged to Barnett. First National discovered that it could not get a permit to erect a similar sign.
Because Gay did not deliver the premises to First National in their original condition and the rooftop sign had been removed by the date the lease was to commence, First National advised Gay that she could not perform in a timely manner. First National repudiated the lease and filed suit both for breach of contract and rescission of the lease. Gay counterclaimed, alleging that First National breached the lease by failing to take possession.
Just prior to trial, the court made First National elect whether it wished to proceed on its contract remedy or its rescission claims. Its objection to the election prior to trial being overruled, First National pursued its contract remedy. After a jury trial, the jury found for Gay and awarded $100,000 in damages. It is from that judgment that this appeal is taken.
In its first point on appeal, First National argues that the trial court erroneously granted Gay's motion to require First National to elect its remedy prior to the commencement of the trial. We agree. Even where remedies are mutually exclusive, an election between such remedies can be made at any time prior to the entry of judgment. Barbe v. Villeneuve, 505 So.2d 1331 (Fla.1987). Although First National could recover only on one remedy, it had the right to await the outcome of the entire trial and elect its remedy at the end of trial. The proper procedure to follow in such a case is outlined in Goldstein v. Serio, 566 So.2d 1338 *787 (Fla. 4th DCA 1990). Where one remedy is a legal remedy to be tried to the jury and one is an equitable action for the court to decide, the factual issues should be submitted to the jury with an interrogatory verdict form so that the jury would be required to resolve the specific factual issues in dispute. Thereafter, the plaintiff would be required to elect the remedy. As in Goldstein, here requiring the premature election of remedies was reversible error.
The trial court also erred in refusing to allow First National to put on evidence that the property was to be delivered to First National in its "original condition" as defined by the oral representations of Gay prior to the signing of the lease. That Gay could not deliver the premises in this condition was used as a defense to Gay's claim that First National repudiated the lease. One exception to the parol evidence rule allows the admission of an oral agreement which is shown by clear, precise, and indubitable evidence to establish a contemporaneous oral agreement which induced the execution of the written contract. Furlong v. First Nat'l Bank of Hialeah, 329 So.2d 406, 408 (Fla. 3d DCA 1976); Wise v. Quina, 174 So.2d 590 (Fla. 1st DCA 1965). The testimony proffered by First National was precise and detailed regarding the representation as to what condition the property would be in when possession was delivered to First National. Furthermore, there was documentary evidence in the form of blueprints and letters of the parties confirming First National's understanding. The exclusion of the evidence was not harmless error because it would have supported First National's defense that Gay did not perform her obligations under the lease. It would also be relevant to the claim of rescission on retrial.
First National also contends that the trial court erred in refusing to give an instruction on "best efforts" in connection with its claim that Gay had failed to use her best efforts to obtain Barnett Bank's early termination of its lease. The instruction First National submitted was as follows:
The contractual term "best efforts" imposes a legal duty of performance more demanding than mere competence, due diligence, or good faith. It requires the party owing the duty to take all action and do all things necessary to consummate the transaction contemplated by the agreement. "Best efforts" means maximizing the contractual benefits of the person to whom the duty is owed even if the benefits to the one owing the duty are reduced. If the duty of best efforts is owed, it must be performed even at a loss.
When presented, the court commented that "the way that reads, you would almost think they have to take an UZI submachine gun and go down there and say `end this lease.'" The trial court denied the instruction, determining that the parties could argue the meaning of the term.
We can locate no definition of "best efforts" in Florida law. It appears that the proposed instruction took its words from In re Heard, 6 B.R. 876, 883 (Bankr.W.D.Ky. 1980), which in turn credits its observations of the meaning of "best efforts" to lectures on economics and law by Professors Charles Geotz and Robert Scott of the University of Virginia. However, the bankruptcy judge also admits that "best efforts" has been rejected by some courts as a meaningless and unprovable standard. Id.
One of the only cases dealing with the rejection of a jury charge on "best efforts" is United Telecommunications, Inc. v. American Television & Communications Corp., 536 F.2d 1310 (10th Cir.1976). The appellant/defendant requested the following proposed instruction defining "best efforts":
A "best efforts" obligation does not require ATC to accomplish a given objective; i.e., register United's stock. Rather, it requires ATC to make a diligent reasonable and good faith effort to accomplish that objective. The obligation takes into account unanticipated events and the exigencies of continuing business and does not require such events or exigencies be overcome at all costs. It requires only that ATC exercise all reasonable efforts within a reasonable time to overcome any hurdles and accomplish the objective. The fact that the objective is not accomplished *788 is no indication that the party has not utilized its "best efforts."
Id. at 1318 n. 7. Instead, the trial court gave an instruction which set forth the parties' various contentions about the meaning of "best efforts," as both parties had introduced evidence regarding the negotiations and performance of the contract bearing on the intended meaning of the term.
The definition of "best efforts" may vary depending upon the factual circumstances surrounding the transaction and the intent of the parties in entering into the transaction. In the instant case, the bank argued that Gay did not use her best efforts because she did not exercise her rights under the lease by declaring a default when Barnett ceased to operate a bank on the premises. Disputing this, Gay's attorney argued that the provision of the Barnett lease was being misinterpreted by First National. The lease provided that the lessee could declare a default where the bank "closed." Gay argued that, under the lease, closure meant that the bank itself went out of business and was being taken over by regulatory agencies. Therefore, Gay could not have declared a default and terminated the lease with Barnett. Thus, she contended that she had used her "best efforts" through her several calls to Barnett personnel to ask it to terminate the lease.
When First National proposed the instruction on best efforts, the trial judge commented that he didn't think that the instruction applied to this case. Where, as here, the interpretation of the term is in dispute, the question is properly for the jury. See United Telecomms., 536 F.2d at 1319. In light of the facts and the contentions of the parties, we cannot find that the trial court erred in refusing to give the particular instruction proffered by First National. Indeed, to give it may have misled the jury by implying that Gay should have terminated the lease with Barnett regardless of any contractual right of Barnett or should have bought Barnett out of its lease. On retrial, however, we do not preclude the parties from offering instructions explaining best efforts in light of the contentions of the parties.[1]
As a final issue on appeal, First National also claims that the trial court erred in refusing to submit an interrogatory verdict question on its affirmative defense to Gay's claim of breach. The trial court submitted the following questions to the jury:
1. Did LUELLA GAY breach the parties' Lease Agreement by failing to use her best efforts to obtain an early termination of her existing Lease with Barnett Bank and, if so, was that breach the legal cause of damage to the FIRST NATIONAL BANK OF LAKE PARK? [And if yes, answer question 2]
2. What are the extent of damages of FIRST NATIONAL BANK OF LAKE PARK?
3. Did FIRST NATIONAL BANK OF LAKE PARK breach the parties' Lease Agreement by repudiating the Agreement and thereafter not complying with the requirement of the Agreement and, if so, was that breach a legal cause of damage to LUELLA GAY?
....
Based on Hospital Mortgage Group v. First Prudential Development Corp., 411 So.2d 181 (Fla.1982), First National requested that the trial court also submit an interrogatory that if the jury found that First National repudiated the lease, they should also determine whether Gay had performed her obligations in accordance with the terms of the lease. The court denied the request.
The failure to include the requested interrogatory on the verdict form could have misled the jury and therefore was an abuse of discretion. Tilley v. Broward Hosp. Dist., 458 So.2d 817 (Fla. 4th DCA 1984). The interrogatories given asked the jury to consider only whether First National Bank had repudiated the lease, and if so, then to calculate *789 the damages of Gay. Without the question requested by First National, the jury was not asked to make a determination on its affirmative defense.
Where interrogatory verdict forms are used, the verdict should include questions on the plaintiff's claims and the affirmative defenses. Otherwise, the jury may not understand that the affirmative defenses must be considered in answering the questions. Ideally, the interrogatory verdict form should track the issues and defenses as set forth in the instructions given by the trial judge.
We do not address the issue raised in the cross-appeal, as it is moot because of our reversal for a new trial.
Reversed and remanded for further proceedings consistent with this opinion.
GUNTHER, C.J., concurs.
FARMER, J., concurs specially with opinion.
FARMER, Judge, concurring specially.
I agree with the majority that it was error to require plaintiff to elect remedies at the beginning of trial and to exclude evidence as to the condition of the subject premises. I also believe, however, that the real problem with the trial court's handling of the case as tried was in its refusal to give any jury instruction as to the legal obligation imposed by the "best efforts" clause in the contract sued on. Hence, in reversing I would also hold that such an instruction would be essential in any new trial.
The controversy between the parties[2] concerns a commercial lease negotiated and executed in 1989 when the demised property was already under a lease to a previous tenant. Thus the new lease calls for the new tenant to take possession sometime in the future. The crux of the dispute centers around the attempts of the parties to get the old tenant to terminate the existing lease early. That dispute was the principal issue tried to the jury; consequently the jury instruction that the trial court refused to give was directly material.
The facts may be outlined as follows. Landlord owned commercial property on Singer Island subject to a lease since 1977 in which the tenant operated a branch bank on the demised premises. The lease contained a provision that allowed landlord to terminate the lease if tenant closed the branch operated on the demised premises. In 1989 tenant decided to close the branch, but continued to pay rent for the unoccupied premises to foreclose any competing bank from operating a bank at the same site.
Later that same year, landlord entered into a new lease with Newbank for the demised premises. Landlord advised Newbank that the premises were subject to an existing lease with tenant, but refused to supply Newbank with a copy of that lease. The new lease provided for Newbank to take possession when landlord, tenant and Newbank agreed in writing to a termination of the old lease; or when tenant terminated the lease itself and restored the premises to their original condition; or not later than November 1992 (some 3 years later).
In this new lease, landlord and Newbank expressly agreed to use their "best efforts and due diligence to secure an agreement" with tenant to terminate the old lease before November 1992. [e.s.] After the new lease was executed, Newbank met with tenant to induce an early termination. It offered to pay tenant's contractual costs of restoring the property to its original condition, and pointed out that early termination would save tenant approximately 3 years of rent for property that tenant was no longer using. Apparently, the only efforts made by landlord to secure an early termination with the tenant, however, were a single conversation with a representative of tenant and a few telephone calls to its corporate offices in Jacksonville. Landlord made no effort to exercise its contract right of early termination arising from the closing of the branch.
*790 Tenant refused to terminate the old lease early. Newbank also learned of problems with a rooftop sign that it contended was a material inducement for the new lease. It further claims that, even though the new lease had no provision as to the precise condition of the premises when it was to take possession, landlord had represented that they be restored to their original condition, which Newbank contends was necessary for it to do so. Because of these problems, Newbank claims it was ultimately forced to negotiate another lease at a nearby location with significantly more expensive terms than the one with this landlord. And so, just 2 days before the new lease with landlord would have commenced in November 1992, Newbank gave notice that landlord would not be able to perform and that it was terminating the new lease. It later filed this suit for damages, principally alleging that landlord had failed to use its best efforts to secure an early termination with tenant under the old lease.
At trial, Newbank offered into evidence the early termination clause in the old tenant's lease with landlord. Landlord disputed Newbank's interpretation as to the legal effect of the termination provision. Apparently, however, the trial court did not construe the termination provision as a matter of law and thus instruct the jury as to the rights and obligations of the parties under that provision in the old lease.
Newbank also proposed a jury instruction as to the legal meaning of the "best efforts" clause in the new lease. The proposed instruction offered by Newbank reads:
"The contractual term `best efforts' imposes a legal duty of performance more demanding than mere competence, due diligence, or good faith. It requires the party owing the duty to take all action and do all things necessary to consummate the transaction contemplated by the agreement. `Best efforts' means maximizing the contractual benefits of the person to whom the duty is owed even if the benefits to the one owing the duty are reduced. If the duty of best efforts is owed, it must be performed even at a loss."
The trial court refused the proposed instruction outright, without specifying what was wrong with it. Instead, he commented that "the way that reads, you would almost think they have to take an Uzi submachine gun and go down there and say `end this lease'." The jury returned a verdict for landlord.
The standard on appeal is whether the failure to give a proposed instruction may have misled the jury. Tilley v. Broward Hosp. Dist., 458 So.2d 817 (Fla. 4th DCA 1984). The record in this case shows to my satisfaction that the failure to give an instruction as to the legal effect of the best efforts clause in this agreement misled the jury. As I have already indicated, the crux of this lawsuit was the best efforts clause. The issues to be tried directly concerned the legal meaning of the clause and the factual dispute as to whether landlord met its obligation under the clause. In fact, I believe that this issue has more direct bearing on the outcome of this case than whether Newbank should have been allowed to adduce evidence as to the condition of the premises.
Although deceptively simple and ostensibly clear, the usual contractual term, best efforts, has little common meaning among lawyers, if this case is any guide. In this instance, moreover, post verdict interviews of these jurors by the trial judge himself demonstrate express uncertainty in the jury as to the nature of the obligation imposed by this provision.[3]
One court has explained that, in general, a best efforts clause requires and is satisfied by mere positive steps toward fulfillment of the contract. Satellite Broadcasting v. Telefonica de Espana, 807 F.Supp. 210, 212 (D.Puerto Rico 1992) ("The duty to exert best efforts requires the parties to take affirmative steps towards the fulfillment of the condition."). In a bankruptcy case, In re Heard, 6 B.R. 876 (Bankr.W.D.Ky.1980), however, the judge reasoned:

*791 "it certainly imposes a legal duty of performance more demanding than mere competence or due diligence. In the view of economists, it means maximizing the contractual benefits of the person to whom the duty is owed, even if the benefits to the one owing the duty have been depleted. Said a slightly different way, if the duty of best effort is owed, it must be performed even at a loss."
6 B.R. at 884. In my opinion, the latter view is closer to the general obligation imposed by such a clause.
I note that this particular clause provided both that the parties would use best efforts and due diligence, so I hardly think that best efforts is limited to due diligence. If a court were to limit the clause to mere due diligence, such a construction would read the conjunction "and" right out of the contract. Yet the parties carefully included both best efforts and due diligence, stressing to me that they intended something beyond merely giving due diligence to the attempt to end the old lease early.
Every contract carries an implied obligation of due diligence and good faith in the performance. See Sherrill v. Alabama Appliance Co., 240 Ala. 46, 197 So. 1 (1940) (contract implied duty of diligently finding sales of churners; such a duty of performance is implied in every contract); Commercial Credit Corp. v. Nelson Motors Inc., 247 S.C. 360, 147 S.E.2d 481 (1966) (there exists in every contract an implied covenant of good faith and fair dealing).
In contracts between commercial parties, however, a best efforts clause is not an ordinary provision. When it does appear, it represents conscious bargaining by the parties and is obviously intended to impose a duty beyond mere good-faith, duly diligent performance of the contract. Indeed, the very adjective "best" obviously connotes a level of performance quite beyond the ordinary.[4] It memorializes an agreement to intensify the level of required performance beyond the ordinary. Therefore it implies a level of skill, dedication and assiduity above the norm for contractual performance. I believe that commercial parties agreeing to a best efforts clause understand that it imposes a duty to use all of the obligor's skill, talents and available resources to achieve the stated purpose.
As applied to the facts of this case, this best efforts clause should be construed by a court to mean that if landlord had a contractual remedy to terminate the old lease because the tenant had closed the branch, then the best efforts clause in the new lease required landlord to make use of the provision. Any other construction of this clause renders it meaningless.
In my opinion, it was error for the trial judge not to specify what was wrong with the proposed instruction and, thereby, give the proponent of it an opportunity to propose an acceptable version. Frankly, the transcript suggests to me that the trial judge was simply opposed to giving any meaningful instruction on the best efforts obligation, and that was error. The parties had a right to have the jury instructed as to legal effect of contractual provisions, whether they are disputed or not. That is, while parties may legitimately dispute factual issues and so argue to the jury that, for example, the other contracting party's performance was or was not in conformity with their contract, it is the trial judge's duty to instruct the jury as to the legal yardstick they must use in deciding whether performance has been as contracted or not.
Turning to the instruction proposed by Newbank, I believe that the first two sentences are entirely correct statements of the legal construction of the clause in suit.[5] The third sentence ("maximizing the contractual benefits") comes close to suggesting the duty of the obligor to use all available resources reasonably at its command. As we have just seen, the best efforts clause in this case *792 imposed a burden on the landlord to use all tools and legal rights at its command to effectuate an early termination of the old lease, even at a cost to landlord. Therefore, I would permit the proponent to have an opportunity to suggest an amendment incorporating that idea.[6]
In this regard, I believe that the trial judge should have construed the old lease as a matter of law and determined what landlord's contractual rights were when tenant closed its doors. He should then have instructed the jury as to the precise legal meaning of the contract remedies, if any, that landlord had at its disposal upon a termination of the old lease.[7] Not to do so is to abdicate making legal determinations to the jury, whose role is to settle disputed facts and apply the law given them by the trial judge to those facts.
It seems to me that the majority, like the trial judge, unduly limit their focus to the factual dispute as to whether the landlord gave its best efforts to secure an early termination of the old lease. I certainly agree that whether the landlord performed its obligation is for the jury to settle. But I do not understand how the jury may fairly be expected to carry out its function without legal guidance from the trial judge as to precisely what obligation the law imposed on this landlord under this contractual provision.
In short, I sense a reluctance to give any meaningful jury instruction on this seemingly simple but legally complex contractual term.[8] It is important in jury trials in contractual disputes for the court to instruct the jury as to the legal rights and obligations under the contract. Judges should not shrink from doing so on the theory that they thereby invade the factual province of the jury. The jury cannot possibly decide whether there has been a breach if they do not know what the law requires the parties to do or not do.
I would require the trial judge to give an instruction on the legal obligations imposed by this clause.
NOTES
[1] One problem here may have been that the jury had to interpret the contract between Gay and Barnett on the meaning of the clause permitting termination when the bank "closed." Construction of a contract is ordinarily a matter of law for the court. See American Med. Int'l, Inc. v. Scheller, 462 So.2d 1 (Fla. 4th DCA 1984). If the court were to determine the proper interpretation of the Barnett/Gay lease, then the jury would have a clearer understanding of what efforts Gay could have taken to terminate the lease.
[2] To facilitate understanding, I shall refer to appellant as "Newbank," appellee as landlord, and Barnett Bank as "tenant."
[3] I reject the lessor's argument on appeal that we may not consider these interviews because they were not elicited under rule 1.431(h). Fla. R.Civ.P. 1.431(h). Under the circumstances here, with the interviews conducted by the trial judge and all counsel present, I think these comments have the kind of reliability we would ordinarily require for evidence.
[4] The AHD offers, among many others, the following appropriate definitions of best: "surpassing all others in excellence, achievement, or quality; ... most ... advantageously; to the greatest degree or extent; ... the supreme effort one can make...." AMERICAN HERITAGE DICTIONARY, (3rd ed.) at 178.
[5] The last sentence is redundant and could be deemed argumentative.
[6] I do not regard the failure of the proponent of the instruction to offer such an amendment to the trial judge as a waiver of the issue. Actually, because the trial judge failed to engaged in any legal construction of the clause, the parties were deprived of a meaningful opportunity to offer a proposed instruction conforming to the law. Accordingly, I would direct the trial judge on remand first to construe the contractual provisions on which the suit rests, and then to allow the parties to offer their proposed jury instructions.
[7] While I agree that what a party does to perform its obligation under a best efforts clause is a factual inquiry based on the facts and circumstances of each case, it is still necessary for the court to instruct the jury as to the legal meaning of the contractual clause under which the party is charged with performance.
[8] There are fewif indeed there are any at all! standard jury instructions applicable to breach of contract cases. Most deal with negligence and related subjects. Frankly, this is one of the great voids in the civil standard jury instructions. Any lawyer who has tried a breach of contract case to a jury will testify to the need for standardized instruction on contractual concepts frequently arising. Even conceding that commercial contracts are often unique, there is no gainsaying the benefits that would flow for trial judges and lawyers alike from having a fund of acceptable instructions on common law contractual terms, especially those as here having a legal meaning perhaps different from the naïve understanding of the words.

One of the few that may be safely compared is Standard Jury Instruction PL 1, dealing with express warranties, which of course arise under contracts of sale. See Fla.Std.Jury Instr. (Civ.) PL
1. The text of that standard instruction states:
"The issues for your determination on the claim of [claimant] are whether the [product sold] by [defendant] was defective when it left the possession of [defendant] and, if so, whether such defect was a legal cause of [loss] sustained by [claimant]. A product is defective if it does not conform to representations of fact made by [defendant] orally or in writing, in connection with the [sale or transaction] on which [claimant] relied in the [purchase and] use of the product. [Such a representation must be one of fact, rather than opinion.]" [e.s.]
The reader will doubtlessly notice that the highlighted sentence merely seeks to define what defective means. Defective is a common word widely used in nonlegal discourse. If the contractual provision of defectiveness needs generalized instruction, I am not able to understand why the far more complex idea of best efforts does not.